CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 19 2013

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ROBIN L. WALKER, | ) | |
| | ) | Civil Action No. 7:12CV00470 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | Hon. Glen E. Conrad |
| MOD-U-KRAF HOMES, LLC, | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

This employment discrimination action under Title VII of the Civil Rights Act of 1964 is presently before the court on the defendant's motion for summary judgment. For the reasons set forth below, the court will grant the defendant's motion.

### Factual Background

The following facts are presented in the light most favorable to the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

Robin L. Walker, a 52-year-old woman, was previously employed by Mod-U-Kraf Homes, LLC ("Mod-U-Kraf"), a modular home manufacturing company based in Rocky Mount, Virginia. Walker worked for Mod-U-Kraf on two different occasions: from 2007 to 2009, when she was laid off due to the downturn in the economy; and from May 2010 until July 2011, when her employment was terminated. She generally worked in the final finishing department, caulking and painting trim inside each house or "box" as it neared the end of the production line.

During her second period of employment with Mod-U-Kraf, Walker began dating one of her coworkers, Ray Cassidy. Cassidy was also terminated in July 2011.

Cassidy had a history of not getting along with another coworker, David Mullins.   During his deposition, Cassidy described Mullins as a "loud foul mouth character who did nothing but stir up trouble" and a "nuisance."   Cassidy Dep. at 34, ECF No. 28-2.   Cassidy testified that Mullins "was always vulgar and loud and arrogant."   Id. at 35.   When asked if he could recall any specific vulgarities, Cassidy provided the following example:

> I was working on a wall one day, and there [were] a couple people standing around with their hands in their pockets, and I am working.   And he leaves his work area, comes over there, and he is showing them something on this telephone, you know, some photos or something.   They are over there carrying on about that, and I am working on some walls.
>
> And he comes over there and grabs his crotch and looks down and says -- and laughs – ["]While you are down there why don't you just . . . .["]   You know, I jumped and got in his face.   I said, ["]Best thing you can do is get your tail back over to your work area and don't come back over here,["] and he cowered down and took off.

Id. at 35-36.

Cassidy also described what he considered to be high school-like behavior by Mullins and another coworker, James Young:

> [Young] would grab his crotch and say, ["]Hey, these nuts are looking for you.["] They would come to my work area and use my table saw and leave a big mess and then, you know, laugh about it.   And then after it continued and continued, I approached them and said, . . . ["]Look, you know, you guys aren't in high school anymore.   You need to clean your mess up over here, and this is my work area.["] And they said, ["]What are you going to do about it?["]   And I said, ["]You just -- you know, clean your mess up.["]   I said, ["]You got a saw over there.   Don't come over here and leave your mess in my area.["]
>
> . . .
>
> And, you know, this was on an every-other daily basis.   They would come over there just to -- just to get somebody's goat.   Just to push people.

Id. at 43-44.

According to Cassidy, Mullins and Young made crude comments to men and women alike:

Q.  [D]id Mr. Mullins say these nuts are looking for you or –

A.  That was [Young's] favorite, but Mullins would go right along with it, blurt it out . . . .

Q.  Did Mr. Mullins say these nuts are looking for you as well . . . ?

A.  Yeah, yeah.

Q.  He said the same thing.

A.  Oh, yeah.   Yeah.   Oh, yeah.

Q.  And these crude comments made by Mr. Young and Mr. Mullins were directed at men and women alike?

A.  Oh, yeah.

Q.  Didn't seem to care.

A.  Anytime they had the opportunity, yeah.   It was just their mentality. That's the way they think.   It's just their mentality, you know.   They see an opportunity to, you know, do something like that they go for it.   Most people just walk on by and say, Oh, that's the way they are.   Just deal with it.   But when they start getting in your face, you know, it's time to stop.

Id. at 89-90.

Another incident occurred when Mullins made a vulgar comment to Cassidy in the presence of Walker.   As Walker was going into a "box" to work, Mullins turned to Cassidy and said, "Well, go on up in that box if you want a blow job.   And then he took off around the corner." Id. at 54.   Cassidy testified that he later "got in [Mullins'] face" and told him to "stop this mess." Id. at 55.

When asked if he had ever heard Mullins make any other comments to Walker, Cassidy testified that he once overheard Mullins say, "Oh, I bet you could holler real loud, couldn't you." Id. at 56.

Walker and Cassidy routinely ate lunch together during their lunch break.   When the employees broke for lunch on July 20, 2011, Walker and Cassidy walked across the parking lot to Cassidy's truck.   Mullins, who was walking in front of Walker and Cassidy, turned around and said, "Wiener in your mouth, wiener in your mouth."   Walker Dep. at 113, ECF No. 28-1.   In response, Cassidy told Mullins to "shut [his] mouth up," and "called him a something redneck." Cassidy Dep. at 60, ECF No. 28-2.

Midway through lunch, Walker called a coworker, Sandra Burnopp, and told her to tell their supervisor, Wayne Craiger, to meet Walker and Cassidy at Cassidy's workstation when they got back from lunch, "because this stuff with David Mullins is going to stop today."   Walker Dep. at 117, ECF No. 28-1.   When they returned inside, "Mullins was looking right at [Walker and Cassidy] laughing."   Id. at 118.   Consequently, rather than returning to Cassidy's workstation and waiting for Craiger, Walker and Cassidy went to Mullins' work station to confront him.   Id. at 120.

When Walker and Cassidy approached Mullins, Cassidy said, "Do you have a problem? This needs to stop."   Id. at 121.   In response, Mullins balled up his fists and said, "Bring it on, bring it on."   Id.   Walker then "got between them, and . . . up in . . . Mullins' face, and . . . pointed [her] finger at him," and said, "This needs to stop right now."   Id.   While Walker denies touching Mullins, other employees, including supervisor Craiger, reported that she made physical contact with him.   See Craiger Dep. at 18, ECF No. 28-3 ("I [saw] her finger poking at him . . . . [I]t looked like she was hitting him on the chest."); Craiger 7/20/2011 Handwritten Statement, ECF No. 28-9 at 3 ("I saw Robin Walker in David Mullins['] face hollering and poking her finger at him."); Mary Jane Johnson Aff. ¶ 3, ECF No. 28-11 at 2 ("I saw [Walker] punching her fingers into [Mullins'] chest."); Mary Jane Johnson 7/20/11 Handwritten Statement, ECF No. 28-11 at 4 ("I

4

. . . witnessed Robin Walker having words in a fussing [manner] with David Mullins [and] she was punching him in the chest with her fingers."); David Mullins 7/20/11 Handwritten Statement, ECF No. 28-9 at 5 (I . . . was attacked by Ray Cassidy and Robin Walker.   She put her hands on me and was pushing me.").   By all accounts, Cassidy stood behind Walker holding up a hammer.   <u>See</u> Walker Dep. at 124, ECF No. 28-1 ("Ray picked up a hammer that was laying on his table and had it up in his hand like this."); Cassidy Dep. at 61, ECF No. 28-2 ("And I picked up the hammer . . . and I heard Sandra [Burnopp] . . . saying, Ray, drop the hammer now.   Drop it.   Drop it."); Burnopp Dep. at 28, ECF No. 28-6 ("I saw [Walker] up at David Mullins' table up in his face and Ray was behind her with a hammer."); Craiger Dep. at 19-20, ECF No. 28-3 ("Ray was standing behind Robin with the hammer.").   Cassidy put the hammer down when he heard Burnopp telling him to do so and after he saw that people were gathering around.

Craiger intervened and directed Walker and Cassidy to go with him to the break room. While walking in that direction, Cassidy got into an altercation with another coworker, Brad Ragans.

On the day of the altercations, the plant manager, Ricky Adkins, received a radio call advising him that he was needed in the plant because of a fight.   He subsequently met with Craiger, Walker, and Cassidy in the break room, and Craiger advised him that there had been two altercations.   In response to Adkins' initial observations, Cassidy said, "If you are going to fire me, fire me now," and Walker said, "Well, if you are firing him, I am quitting."   Walker Dep.   at 132, ECF No. 28-1.   Adkins indicated that he had not yet made any decisions and advised Walker to go back to work.

Adkins asked one of the other supervisors, Jeff Manning, to take Cassidy to the conference room and obtain a statement from him.   Manning drafted the following statement, which Cassidy reviewed and signed:

Ray says that Robin has complained to her supervisor before.

Ray says they[] get in their little groups [and] joke and laugh[] and look[] toward him.

Ray says he has had trouble with Brad [Ragans] a couple of times before and numerous times with David Mullins.

Today's confrontation start[ed] in the parking lot walking out going to lunch[.] Ray and Robin were walking together[.]   David was coming from another direction, waited until he got beside them and gestured something about "putting the weenie in the mouth" and looked at them and laughed[.]   Ray said ["]G.D. Redneck need[s] to keep hi[s] mouth shut.["]   Later after lunch Ray approached David and told him, "Look you need to" and David backed up, brushed up, and said ["]bring it on.["]   Ray says this is not the first time he has ask[ed] David to keep his comments to himself and stop the B.S.

Ray Cassidy 7/20/11 Written Statement, ECF No. 28-10 at 2.   When Manning asked Cassidy if he had anything else to add, Cassidy wrote the following additional comments:

David Mullins made a remark as to that box (where Robin was working) was where to get a blow job.

Brad [Ragans] ma[de] sexual innuendos in my face.   (Sticking tongue out and laughing [and] jeering).

It would seem to me that if employees would mind their own business more work would get done.   I had told David Mullins before that his laughing and joking and carrying on about what was being said and joked about needed to stop.

Id. at 4.

Manning then obtained the following statement from Walker:

[A]bout May 2011[,] David Mullins would make accusations about me[.]   I was going in the box to work and David said ["]if you want a blow job go up in that box[."]   I think I was the only person in that box[.]   When I walk[ed] past his table, he would say stuff like "There she goes, there it is" – 2 or 3 times a week.

6

> Today we were walking out to lunch, me and Ray[.]   David and John Craft were in front of us[.]   David kept saying, "wiener in the mouth" over and over, laughing.
>
> During lunch I told Ray I was tired of David's mouth.   I called Sandra and told her to tell Wayne to meet us at Ray's table after lunch.   Coming back from lunch, going to Ray's table[,] we had to go by David's area[.]   David turned and started looking and laughing at us[.]   Ray went over and ask[ed] him what he was laughing at.   Argument [e]nsued.   Plant manager got there and told us to go to break room.   We passed by Brad [Ragans] and pushing [e]nsued.   Don't know who pushed first.

Walker 7/20/11 Written Statement, ECF No. 28-10 at 6.

While Manning obtained statements from Walker and Cassidy, Adkins began interviewing other employees.   He obtained signed written statements from David Mullins, Brad Ragans, Sandra Burnopp, Mary Jane Johnson, and Wayne Craiger.   He also talked to John Craft, James Young, and Regina Chaney.

Cassidy was immediately suspended for three days pending further investigation. Because Walker and Cassidy rode to work together, Adkins advised Walker that Cassidy had been suspended but that he could pick her up that day from work.   Adkins informed Walker that she would need to drive to work for the next couple of days.

Adkins then proceeded to discuss the results of his investigation with Kathy McDaniel from Human Resources.   Jointly, they decided that Walker and Cassidy needed to be terminated. When asked to provide the reason for Walker's termination, McDaniel testified that Walker was terminated for misconduct, specifically for "put[ting] her hands on David Mullins."   McDaniel Dep. at 36, ECF No. 28-7.   Likewise, Adkins testified that Walker was terminated for "fighting with David Mullins on-site."   Adkins Dep. at 26, ECF No. 28-4.

On Thursday, July 21, 2011, Adkins and McDaniel called Cassidy and notified him that his employment was terminated.   Adkins planned to notify Walker, in person, of the decision to terminate her employment, but Walker called in sick on July 21, 2011 and July 22, 2011, and

page8

McDaniel was out of the office on the second day.   Therefore, the decision was made to wait until

Walker returned to work on Monday, July 25, 2011.

On Friday, July 22, 2011, Walker was examined by Dr. Steven Lewis at Smith Mountain

Lake Family Practice.   During the examination, Walker indicated that she was having nerve

problems.   Dr. Lewis diagnosed her with job stress and depression, and issued a prescription for

Citalopram, an antidepressant.[1]

On Monday, July 25, 2011, Walker left a message indicating that she would be out for two

weeks due to nerve problems.   Adkins and McDaniel called her later that day and advised her that

she had been terminated for misconduct.

At the end of July, Walker called the phone number listed in the Mod-U-Kraf employee

handbook for reporting harassment.   After leaving several messages, Walker eventually spoke to

a man whose name she could not recall at her deposition.   Walker testified that she told him that

she "was terminated for wrong reasons . . . and [she] thought that it needed to be checked into."

Walker Dep. at 85, ECF No. 30-20.

On August 12, 2011, Adkins issued David Mullins a written reprimand for violating the

company's anti-harassment policy on July 20, 2011.   The disciplinary form was issued at the

direction of Les Thelimar, Mod-U-Kraf's Vice President of Human Resources.   The form states

that "complaints were made against [Mullins] during an investigation and [were] not reported until

later," and that Mullins is "not to make any comments to other employees."   Pl.'s Ex. 17, ECF No.

---

[1] This was not the first time that Walker was diagnosed with depression.   An exhibit submitted by
Walker indicates that, in December of 2005, before she ever worked for Mod-U-Kraf, Walker was
prescribed Cymbalta after complaining that her "nerves [were] so bad that she would not have the mentality
or the personality to be a good employee."   ECF No. 30-8.   Exhibits submitted by the defendant indicate
that the plaintiff was prescribed Ativan for "nerves" in February of 2010, before she returned to work for
Mod-U-Kraf, and that she was prescribed Alprazolam (Xanax) beginning in August 2010.   ECF Nos. 36-3
at 3, 36-4 at 3.

30-17.   During his deposition, Adkins testified that Thelimar instructed him to issue the

disciplinary form and told him what the form should say.   Adkins Dep. at 35-37, ECF No. 30-22.

Both Walker and Cassidy subsequently filed charges of discrimination with the Equal

Employment Opportunity Commission ("EEOC").   In her charge of discrimination, Walker

claimed that she was sexually harassed by David Mullins and James Young.   She also claimed

that she reported the sexual harassment to her line leader, Sandra Burnopp, and to her supervisor,

Wayne Craiger, and that she believed that she was discharged in retaliation for reporting the

harassment.

Walker filed the instant action on October 31, 2012.   In her amended complaint, Walker

claims that she was subjected to a hostile work environment because of her sex.   The claim is

based on the following misconduct by Mullins and Young:

1.   Mullins "would grab himself and would say, These nuts are looking for you."   Walker

Dep. at 88, ECF No. 28-1.   He did this "two or three times a week."   Id. at 89.

2.   On one occasion, Mullins instructed Cassidy to "go on up in that box [where Walker was

working] if [Cassidy wanted] to get a blow job."   Cassidy Dep. at 54, ECF No. 28-2;

Walker 7/20/11 Handwritten Statement, ECF No. 28-10 at 6.

3.   Two or three times per week, when Walker walked by Mullins, he would say, "'There she

goes, There it is.'"   Walker 7/20/11 Handwritten Statement, ECF No. 28-10.

4.   On one occasion, Mullins looked over to where Walker was working and said, "Oh, I bet

you could holler real loud, couldn't you."   Cassidy Dep. at 56, ECF No. 28-2.

5.   On one occasion, Mullins grabbed his crotch in front of another female employee and said,

"While you are down there why don't you just . . . ."   Id. at 35.

6. Mullins referred to new female employees as "fresh meat."   Walker 10/12/11 Typewritten Statement, ECF No. 30-5.

7. On the day of the altercation with Mullins, Mullins turned to Walker and Cassidy and "kept saying, Wiener in your mouth, wiener in your mouth."   Walker Dep. at 113, ECF No. 28-1.

8. James Young would "grab [himself]" and say "These nuts are looking for you."   Id. at 94. Young would do this "[e]very day beginning in March or April [of 2011]."   Id. at 96.

See Pl.'s Resp. in Opp'n at 2-3, ECF No. 30.

Walker also contends that she was terminated in retaliation for complaining about her coworkers' misconduct.[2]   During her deposition, Walker testified that at the beginning of 2011, she began complaining to Craiger, every week, about Mullins' "these nuts" comments.   Walker Dep. at 91, ECF No. 28-1.   Walker testified that Craiger eventually spoke to Mullins, and that the comments "continued [to be made], but not as often."   Id. at 92.   Walker also emphasizes that she complained about Mullins' behavior on July 20, 2011, the day before the decision was made to terminate her employment.

The case is presently before the court on the defendants' motion for summary judgment. The court held a hearing on the motion on November 19, 2013, during which the parties confirmed that the motion had been fully briefed and was ripe for review.

### **Standard of Review**

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2] This claim is not specifically pled in Walker's amended complaint.   Nonetheless, Mod-U-Kraf liberally construed the amended complaint to raise a claim for retaliation, and both parties briefed the claim as if it had been properly pled in the amended complaint.

Fed. R. Civ. P. 56(a).   In determining whether to grant a motion for summary judgment, the court

must view the record in the light most favorable to the non-movant.   Anderson, 477 U.S. at 255.

To withstand a summary judgment motion, the non-movant must produce sufficient evidence from

which a reasonable jury could return a verdict in her favor.   Id. at 248.   "Conclusory or

speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the

non-movant's] case."   Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)

(quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).   In assessing a

summary judgment motion, a court may consider only the evidence that would be admissible at

trial.   See Maryland Highways Contractors Ass'n, Inc. v. State of Maryland, 933 F.2d 1246, 1251

(4th Cir. 1991).

## Discussion

### I.       Hostile Work Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect

to [her] compensation, terms, conditions, or privileges of employment, because of such

individual's . . . sex.   42 U.S.C. § 2000e-2(a)(1).   Since an employee's work environment is a

term or condition of employment, Title VII provides a cause of action for hostile work

environment.   EEOC v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001) (citing Meritor Sav.

Bank, FSB v. Vinson, 477 U.S. 57, 73 (1986)).   To make out such a claim, a female plaintiff must

demonstrate that "the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was

sufficiently severe or pervasive to alter the conditions of her employment and create an abusive

work environment, and (4) was imputable to her employer."   Ocheltree v. Scollon Prods., Inc.,

335 F.3d 325, 331 (4th Cir. 2003) (en banc).   In this case, the court concludes that Walker has

failed to show that her coworkers' conduct "was sufficiently severe or pervasive to alter the conditions of her employment" and, thus, that her claim fails under the third element.[3]  Id.

The third element of a hostile work environment claim has both subjective and objective components.  Id. at 333.  "The environment must be perceived by the employee as hostile or abusive, and that perception must be reasonable."  Ziskie v. Mineta, 547 F.3d 220, 227 (4th Cir. 2008).  When determining whether the offending conduct was objectively "severe or pervasive," courts "consider all of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Ocheltree, 335 F.3d at 333 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  Courts also consider the comparative power between the harassers and the victim.  See Ziskie, 547 F.3d at 227-28.

The United States Court of Appeals for the Fourth Circuit has emphasized that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test."  EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).  In order to be actionable, "the harassing 'conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment.'"  Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  "Activities like simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct."  EEOC v. Fairbrook Med. Clinic, 609 F.3d 320, 328 (4th Cir. 2010).

After careful review, the court concludes that Walker's evidence of misconduct by Mullins and Young is insufficient, as a matter of law, to meet the high bar required to survive summary judgment on a hostile work environment claim.  While some of the comments made by Young and Mullins were clearly inappropriate, and the court has no reason to doubt that Walker found

---

[3] In light of this conclusion, the court need not address the defendant's argument that Walker has also failed to demonstrate that the offending conduct was based on her sex.

12

them offensive, her coworkers' behavior was simply not of the same magnitude as that which the Fourth Circuit has found sufficiently severe or pervasive to constitute actionable sexual harassment.   See Ziskie, 547 F.3d at 227 (emphasizing that, to survive summary judgment, "the alleged harassment, even if because of gender, must still be objectively as severe as that in cases that [the Court has] allowed to go to a jury").

For instance, in Smith v. First Union National Bank, 202 F.3d 234 (4th Cir. 2000), the Fourth Circuit reversed the entry of summary judgment for the defendant, where the plaintiff's male supervisor "subjected [her] to a barrage of threats and gender-based insults," some of which were made more than thirty times during the first weeks under his supervision.   Id. at 238.   The supervisor routinely made demeaning comments about women, telling the plaintiff that another female employee who appeared upset "needed a 'good banging,'" that 'the only way for a woman to get ahead at First Union was to spread her legs,'" and that "he wished he had been a woman so that he could 'whore his way through life.'"   Id.   In addition, the supervisor's behavior was "often threatening."   Id.   He would frequently stand over the plaintiff's cubicle barking orders at her and "conclude[] his orders . . . with the remark, 'or else you'll see what will happen to you.'"   Id.   On another occasion, after the plaintiff elected not to remain on the supervisor's team, he "grabbed the handles of [her] chair," "spun her around to face him," and said that "he could 'see why a man would slit a woman's throat.'"   Id.

In Ocheltree v. Scollon Productions, the Fourth Circuit affirmed the denial of the defendant's motion for judgment as a matter of law, where the plaintiff was subjected to a "daily stream" of sex-based discussion and conduct by her male coworkers and supervisor in a costume production shop in which she was the only female employee.   Ocheltree, 335 F.3d at 328-29. The men repeatedly used a female mannequin as a prop to demonstrate sexual techniques in front

of the plaintiff, and presented her with a pornographic book containing pictures of men with pierced genitalia.  Id. at 328.   They also used "explicit sexual insults" in front of the plaintiff, which included comments regarding anal sex and "sex with a dog."  Id. at 329.   Additionally, the plaintiff's male coworkers "constantly discussed their sexual exploits with their wives and girlfriends in extremely graphic terms,"[4] and, on one occasion, the plaintiff's supervisor expressed an interest in "having sex with young boys."  Id.

In EEOC v. Fairbrook Medical Clinic, the Fourth Circuit reversed the entry of summary judgment in favor of the defendant, where the allegations, if proven, showed that the sole owner of the medical clinic "targeted [a female physician] with highly personalized comments designed to demean and humiliate her."  Fairbrook Med. Clinic, 609 F.3d at 328.   For instance:

> While [the female physician] was pregnant, [the owner] frequently commented about the size of her breasts.   After she gave birth, he asked to see her breasts and to pump them, stated that he wanted to lick up her breast milk, inquired about the status of her libido, and opined that she was probably a "wild thing" in bed.

Id.   The physician testified that the frequency of the owner's conduct escalated after she returned from maternity leave, and that by her estimation, he made comments about her breasts at least once or twice a week during a two-month period.  Id. at 330.   The Fourth Circuit emphasized that "[t]he impact of these comments may have been aggravated by the fact that [the owner] had previously made comments to [the female physician] about his genitals and those of his wife."  Id. at 329.   With respect to his own anatomy, the owner had previously "display[ed] an image of his

---

[4] For instance:

> The men talked everyday about their sexual experiences of the night before, making comments about their female partners such as "she swallowed, she gave good head, [or] I fucked her all night long."   One employee announced that his girlfriend "gave good head[,] that she likes to swallow, that she liked it from behind, [and] that she would do it anywhere with him."

Ocheltree, 335 F.3d at 329 (internal citations omitted).

14

penis twenty-five to thirty times and referr[ed] to it as 'Mr. Happy' on five to ten of those occasions." Id. at 330.   Although there was no indication that the owner had ever touched the physician inappropriately, the Fourth Circuit emphasized that "there [was] evidence that he, at least implicitly, proposed that they engage in sexual activity," when the owner said that she "owed him 'big' for his help in [a particular] matter and asked if she would let him pump her breasts." Id.

Most recently, in Okoli v. City of Baltimore, 648 F.3d 216 (4th Cir. 2011), the Fourth Circuit vacated the entry of summary judgment in favor of the employer on the plaintiff's hostile work environment claim, where the plaintiff's boss, during a span of just four months, propositioned her to have sex with him in a Jacuzzi on multiple occasions, asked questions about her underwear, and described sexual experiences that he had previously engaged in with another woman and the woman's daughter.  Id. at 217-18.   During the same time period, the plaintiff's boss fondled her legs under a conference table two or three times during morning meetings, and forcibly grabbed and kissed her in a conference room.  Id. at 218; see also Harris v. Mayor and City Council of Baltimore, 429 F. App'x 195, 198-89, 202 (4th Cir. 2011) (reversing grant of summary judgment on a hostile work environment claim, where women "were regularly referred to as 'bitches' [and] 'cunts,'" a male coworker "repeatedly referred to [the plaintiff] as a 'bitch' without condemnation by [the plaintiff's] supervisor," and both extremely graphic discussions between coworkers about sexual activity with women, and discussions about female anatomy, occurred regularly).

Here, unlike the foregoing cases, Walker does not allege that Mullins or Young ever touched her inappropriately, or earnestly propositioned her for sexual acts.  She does not allege that they went out of their way to disgust her and make her feel uncomfortable by engaging in

demonstrations of sexual acts or extremely graphic discussions regarding their sexual activity. She does not suggest that she was subjected to frequent comments about her body.   She does not claim that she was exposed to demeaning, gender-based epithets or subjected to physical threats.

Instead, Walker describes a workplace in which it was not uncommon for two of her co-workers to act in a boorish, moronic manner.   "[W]hile no one condones boorishness, there is a line between what can justifiably be called sexual harassment and what is merely crude behavior." Ziskie, 547 F.3d at 228.   The actions that occurred most frequently -- Mullins and Young's "these nuts" antics -- were clearly inappropriate and unprofessional, but they were not so extreme as to amount to a change in the terms and conditions of Walker's employment.   Additionally, it is undisputed that these comments were not directed at Walker exclusively, and that they were instead made to male and female employees alike.   See Fairbrook Med. Clinic, 609 F.3d at 328-29 ("We have previously recognized that there is a difference between 'generalized' statements that pollute the work environment and 'personal gender-based remarks' that single out individuals for ridicule.   Common experience teaches that the latter have a greater impact on their listeners and thus are more severe forms of harassment.").   The court likewise concludes that Mullins' "blow job" and "wiener in the mouth" comments, and his remark that he "bet [Walker] could holler real loud," each of which were made in front of Walker and her boyfriend on one occasion, are not sufficient to establish a workplace that is "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."   Harris, 510 U.S. at 21 (internal citations and quotation marks omitted).   Instead, they are examples of "the kind of rude behavior, teasing, and offhand comments that [the Fourth Circuit has] held are not sufficiently severe and pervasive to constitute actionable sexual harassment."   Singleton v. Dep't of Corr. Educ., 115 F. App'x 119,

122 (4th Cir. 2004); see also Czemerda v. Barcoding, Inc., No. CCB-11-3244, 2013 U.S. Dist. LEXIS 103282, at *9 (D. Md. July 24, 2013) (holding that a male employee's offensive remarks, which included offering to give the female plaintiff a "pap smear" and another colleague a "blow job," were not sufficiently severe or pervasive to create an abusive working environment); Sraver v. Surgical Monitoring Servs., Inc., No. CCB-05-01331, 2006 U.S. Dist. LEXIS 55222, at *14-15 (D. Md. July 27, 2006) (holding that allowing the plaintiff to pursue a hostile work environment claim under the circumstances "would not be consistent with controlling Fourth Circuit law," where the plaintiff alleged that her boss regularly questioned her about her sex life and once advised her that she would "'get a bonus when [he got] a blow job'").

Walker has also failed to proffer evidence from which a reasonable jury could find that Mullins and Young's actions unreasonably interfered with her work performance.   Although Walker testified that she thought that Mullins' behavior slowed down her performance at work, she acknowledged that she "had two less people doing the same amount of work" during the same time period, and that her increased workload also contributed to her "stay[ing] behind."   Walker Dep. at 164-65, ECF No. 30-20.   Additionally, while the record reveals that Walker has a history of anxiety and depression, which may have been aggravated by her coworkers' conduct, "not every workplace aggravation gives rise to an actionable legal claim."   Andrews v. Staples the Office Superstore East, Inc., No. 7:11CV00037, 2013 U.S. Dist. LEXIS 92011, at *32 (W.D. Va. July 1, 2013) (citing EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 316 (4th Cir. 2008)).   "Instead, the objective prong of the test is 'designed to disfavor claims based on an individual's hyper-sensitivity.'"   Id. (quoting Fairbrook Med. Clinic, 609 F.3d at 328).

This case is also distinguishable from a number of existing Fourth Circuit cases, since the relative power between Walker and her alleged harassers does not contribute to making their

conduct more severe.   As the Court observed in <u>Ziskie</u>, hostile work environment cases that have

succeeded in this circuit "have often involved a disparity in power between the harasser and the

victim."   <u>Id.</u> at 227.   For instance, in <u>Jennings v. University of North Carolina</u>, 482 F.3d 686 (4th

Cir. 2007) (en banc), the Court emphasized that the harasser "was a forty-five-year-old man

probing into and commenting about the sexual activities of young women, some of whom, like

Jennings, were as young as seventeen."   <u>Jennings</u>, 482 F.3d at 697.   In <u>Ocheltree</u>, the victim's

supervisor participated in the "daily stream" of sex-based discussion and conduct alleged by the

victim.   <u>Ocheltree</u>, 335 F.3d at 328-29.   In reversing the district court's grant of summary

judgment to the defendant in <u>R&R Ventures</u>, the Fourth Circuit found that the objective severity of

the harassment was compounded by the fact that the harasser "was an adult male in a supervisory

position over young women barely half his age."   <u>R&R Ventures</u>, 244 F.3d at 340.   Likewise, in

<u>Fairbrook Medical Clinic</u>, the Court observed that "a jury could likewise conclude that [the]

severity of [the harasser's] conduct was exacerbated by the fact that he was not only [the victim's]

immediate supervisor but also the sole owner of [the medical clinic at which the victim worked]."

<u>Fairbrook Med. Clinic</u>, 69 F.3d at 331.   Here, the conduct alleged by Walker "does not remotely

resemble the repeated harassing conduct by someone in a position of authority that was described

in other cases."   <u>Ziskie</u>, 547 F.3d at 228.   Instead, Walker alleges that she was subjected to

harassment by two coworkers, not her supervisors.

   In sum, the court concludes, based upon all of the relevant factors, that there is not enough

evidence from which a jury could find that the conduct at issue was sufficiently severe or pervasive

to create an abusive working environment.   There is no question that the conduct engaged in by

Mullins and Young was inappropriate and immature.   Nonetheless, the workplace Walker

describes, "though crude, is not the hellish environment against which Title VII protects."

Greene v. A. Duie Pyle, Inc., 371 F. Supp. 2d 759, 763 (D. Md. 2005).   Accordingly, while the court does not condone her coworkers' behavior, it must grant summary judgment to Mod-U-Kraf on the hostile work environment claim.

## II.   **Retaliation**

Walker also contends that Mod-U-Kraf terminated her in retaliation for complaining about sexual harassment.   In addition to prohibiting discrimination on the basis of a protected trait, Title VII makes it unlawful for an employer to retaliate against an employee "because [the employee] has opposed any practice made an unlawful practice by this subchapter."   42 U.S.C. § 2000e-3(a). When there is no direct evidence of retaliation, a plaintiff may proceed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   See Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004).   This framework requires the plaintiff to initially establish, by a preponderance of the evidence: (1) that she engaged in a protected activity; (2) that the defendant took a materially adverse action against her; and (3) that a causal connection existed between the protected activity and the materially adverse action.   EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005).   With respect to the causation element, the Supreme Court recently clarified that a Title VII retaliation claim requires the plaintiff to show but-for causation.   Univ. of Tx. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013).   That is, a Title VII retaliation plaintiff must establish that "her protected activity was a but-for cause of the alleged adverse action by the employer," and not merely a "motivating factor."   Id.

Once a plaintiff establishes her prima facie case, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse action.   Price, 380 F.3d at 212.   "If the employer sets forth a legitimate, nonretaliatory explanation, the plaintiff then must show that the employer's proffered reasons are pretextual or [her] claim will fail."   Id.   In other words, the

19

burden shifts back to the plaintiff "to show that the [employer's] reason is mere pretext for retaliation by proving both that the reason was false and that discrimination was the real reason for the challenged conduct." Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (internal citation and quotation marks omitted).

In this case, even assuming that Walker has set forth a prima facie case of retaliation, Mod-U-Kraf has articulated a legitimate, nonretaliatory reason for terminating her employment, namely, her involvement in the fight with David Mullins.   Because Mod-U-Kraf has clearly met its burden of proffering a permissible reason for its termination decision, Walker must show that the asserted reason is pretext for retaliation.   While Walker advances several arguments in an attempt to establish pretext, the court concludes that she has failed to create a genuine issue of material fact with respect to this issue.

Walker first argues that she "never touched Mullins," and that the evidence demonstrates that she merely fussed at Mullins about the comments that he made in the parking lot. Pl.'s Br. in Opp'n at 8, 39, ECF No. 30.   This argument, however, misconstrues Walker's burden. When an employer articulates a legitimate, nonretaliatory basis for terminating a plaintiff, this court does not "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (internal citation and quotation marks omitted).   In assessing whether an employer's proffered reason is pretextual, "it is the perception of the decisionmaker which is relevant." Holland, 487 F.3d at 217 (internal quotation marks and alterations omitted).

In the instant case, Walker has failed to proffer evidence from which a reasonable jury could find that the Mod-U-Kraf officials responsible for terminating her employment did not honestly believe that Walker had engaged in misconduct on the day in question.   "The key inquiry

in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 598-99 (6th Cir. 2007) (internal citation and quotation marks omitted).   Here, the record establishes that Ricky Adkins investigated the matter, asked one of his supervisors to collect statements from Walker and Cassidy, and then personally interviewed eight other employees in order to determine why the fight occurred and who was responsible.   After sharing the results of his investigation with Kathy McDaniel, Adkins and McDaniel determined that Walker, along with her boyfriend, verbally and physically attacked Mullins, and that their conduct warranted termination.   While Walker may disagree with the outcome of the investigation, she has failed to raise a triable issue of fact as to whether Adkins and McDaniel honestly believed that Walker deserved to be discharged for her involvement in the altercation.   Even if she could show that their understanding of the altercation was mistaken, such a showing is not sufficient to demonstrate pretext.   See Gibson v. Fluor Daniel Servs. Corp., 281 F. App'x 177, 179 (4th Cir. 2008) (emphasizing that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct") (internal citation and quotation marks omitted); see also Dunbar v. Md. Primary Care Physicians, LLC, No. 04-2663, 2005 U.S. Dist. LEXIS 10291, at *10 (D. Md. May 27, 2005) ("[Plaintiff] seems to contend that because her co-worker was not disciplined in consequence of the confrontation which led to [plaintiff's] termination, a genuine issue of material fact is presented.   She is wrong.   The record shows indisputably that defendant carefully and thoroughly investigated the incident, and made the reasonable judgment that [plaintiff] instigated it and was . . . responsible.").

21

The court must also reject Walker's argument that Adkins' investigation of the incident in question was inadequate.   As the Fourth Circuit has previously explained, focusing on the quality of the investigation "misses the point," since "[a] federal court 'does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.'"   Cupples v. AmSan, LLC, 282 F. App'x 205, 210 (4th Cir. 2008) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998).   Instead, the court's "sole concern is whether the reason for which the defendant discharged the plaintiff was [retaliatory]."   DeJarnette, 133 F.3d at 299.   Thus, even if Adkins' investigation was substandard, "that does little to help [the plaintiff] establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that [retaliation] was the real reason for the termination."   Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011).   Likewise, the fact that Adkins was later instructed to discipline Mullins for violating the company's anti-harassment policy is not probative of pretext.   Simply stated, no reasonable jury could infer from this evidence that the reason given for Walker's termination was false, or that retaliation was the real reason for the employment decision.

Finally, the mere fact that Adkins and McDaniel "knew of Walker's complaints prior to terminating her" is insufficient to withstand summary judgment.   Br. in Opp'n at 38, ECF No. 30. The Fourth Circuit has made clear that "mere knowledge on the part of an employer that an employee it is about to fire has [made] a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee." Williams v. Cerberonics, Inc., 871 F.2d 452, 460 (4th Cir. 1989); see also Nathan v. Takeda Pharmaceuticals America, Inc., 890 F. Supp. 2d 629, 648 (E.D. Va. 2012) ("[A]s the Fourth Circuit has stated, temporal proximity alone, while perhaps sufficient to establish causation for the

purposes of a prima facie case, cannot create a sufficient inference of pretext.").

For all of these reasons, the court concludes that Walker has failed to rebut the legitimate, nonretaliatory reason Mod-U-Kraf proffered to support its decision to terminate her employment. Accordingly, Mod-U-Kraf is entitled to summary judgment on her claim of retaliation.

## Conclusion

For the reasons stated, the court will grant the defendant's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This ___ day of December, 2013.

Chief United States District Judge